Thank you. Morning, may it please the court. I'm Stephen Fiebiger on behalf of Appellant Tori Evans. Evans seeks reversal of summary judgment of her claims under the ADA for discriminatory discharge, failure to provide reasonable accommodation and retaliation, as well as her FMLA entitlement and discrimination claims. Evans challenges the district courts upholding CRC's imposition of attendance points based on, one, CRC's policy requiring notification of both a supervisor and human resources of her intention to take FMLA leave when CRC had actual notice. Two, not receiving an opportunity to show that her absences in March of 2017 prior to her discharge were FMLA related. Three, determining that her absences from July 11th to 15th of 2016 were for unrelated medical issues when she called in for FMLA, saw her doctor for symptoms related to her autoimmune flare-up disorder, and the doctor testified he did not see her for a knee injury on that date. And fourth, that she was deemed to have exhausted her FMLA leave that was allotted by CRC for use of her flare-ups when she called in for FMLA when she had over six weeks remaining at the time of her discharge. With respect to her FMLA discrimination and ADA retaliation claims, she satisfies the causation connection of the prima facie case by the temporal proximity of a protected request for FMLA leave on March 10th, 2017, and her discharge shortly thereafter on March 27th. Additionally, genuine issues of material fact exist for pretext for Evans' FMLA discrimination and ADA discharge and discrimination claims. Finally, genuine issues of material fact exist under failure to accommodate claim that should be resolved by a jury. I'd like to first look at the FMLA entitlement claim and indicate that the District Court erred granting summary judgment on this claim by ruling that she failed to give notice of her intention to take leave on October 17th of 2016. The record's clear that she did call CRC and give notice of her intention to take FMLA leave by advising her manager, Carrie Wiley, of her need to take FMLA. The records show that she was pre-approved for PTO the second half of the afternoon from 1 to 4, but not granted the FMLA leave for the morning hours of 8 to noon, I think it was. This is Jed Smith. If I understand correctly, the company's policy for obtaining FMLA was a two-step process. There were two notices to be given, one to the supervisor and one to HR. Were both of those complied with? Not on this occasion, on October 17th. But, Your Honor, I think that's just the point here with respect to the actual notice issue. The regulation governing notice of intent to take FMLA is 29 CFR 825.303C, and that is indicating that an employer can require their employees, as a usual custom and policy, to designate an individual or a specific number. It doesn't go beyond that. It basically allows that those particular individuals or number be designated, but it doesn't allow for multiple layers of call-ins, and the result by doing so is that it circumvents the ability of employees like Ms. Evans to take reasonable medical leave when they call in. And here, I think it's important to point out that the district court didn't find that Ms. Evans hadn't provided actual notice. It found that she didn't comply with their policy, and there's really a difference because the law requires that she provide actual notice of her intention to take the FMLA leave, and she did that in this instance. Are you familiar with our Garrison v. Dalgan Corp case from 2019 that addressed the policy of a company that required notice to both a supervisor and to HR? Your Honor, I acknowledge that not specifically. I make the same argument in any event, Your Honor, that the requirement for multiple layers of call-in notice exceeds the parameters of the regulation as well as the FMLA when the employer has actual notice. Counsel, do you have circuit court support for that argument from anywhere? I do not, Your Honor, other than what we cited in our brief. It's the interpretation that we're advancing. Well, even the regulation says an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave. So if it's a two-part usual and customary, why wouldn't that be just fine? I think the concern, Your Honor, is that the intent of the notice provision is to provide notice of intention to take FMLA leave. She's required to give notice of her qualifying reason or that she wants FMLA leave. It's our position that she did that on that occasion where she called in to one or the other, whether it was HR and not her supervisor or calling her supervisor and not HR. There's other circumstances in Ms. Evans' employment that we've set out in the brief. I think it was in June of 2016 and then there was an October 11, 2016, where she was approved for FMLA leave by calling just one or the other. I think that's indicative of the company acknowledging that it had actual notice of her desire to take FMLA leave and granted it on those dates where the specific letter of the policy was not adhered to. So it's our position that the company shouldn't pick and choose when to enforce the policy like they did here with Ms. Evans, and it cost her the event point that added up to her discipline total, eventually contributing to her 10 points for the discharge. Another piece that I think relates to the FMLA leave issue is the district court's finding that Ms. Evans' absences for July 11th through the 15th of 2016 were for unrelated medical issues. The record presents sufficient evidence from which a jury could find that Ms. Evans was off for FMLA leave for that time frame. July 11th specifically, she had gone in to see her doctor, Dr. Angstman, and he saw her in the clinic. There's a clinic note that reflects that. She displayed mouth sores. She had other symptoms from her autoimmune disorder at that visit, and the doctor testified in his deposition that this visit on July 11th was not related to a knee issue or a potential knee issue. Yet the district court found that that entire week was unrelated to her FMLA leave because she had gone for an orthopedic consultation later in the month on July 28th that was recommended by Dr. Angstman. But there's no medical evidence that connected her knee issues in the week of July 11th to the 15th to the orthopedic visit that was later in the month. And more importantly, there was no medical evidence connecting the district court's finding that her time off from July 11th to the 15th were for unrelated medical reasons rather than her FMLA autoimmune condition. Her doctor had also submitted a letter on June 12th excusing her from work, and the onus, I think, is up to the employer to ask for some kind of clarification. They could go back eventually and ask for recertification as to whether her leave time was really FMLA related, but they didn't do any of that. Instead, they just imposed event points that ultimately added up to her discharge. I'd like to just touch briefly on some of the issues of pretext that we think are evident in the case. Number one, Ms. Evans was not provided a final written warning prior to her discharge on March 27th. The facts are set out in the brief, but essentially she had called in on March 22nd, was having issues with her voice. She had a fever. I don't understand how that's pretextual evidence. I don't think the district court did either. No, the district court did not, but it is pretext, Your Honor, because the company policy requires that when an employee reaches nine event points, they're entitled to receive a final written warning, and it's for good reason. So the employee knows that they're at nine event points, and one more point will trigger a discharge or put them on the cusp of discharge. Here, for Ms. Evans, apparently that's pretext. Pretext has to be something that suggests a discriminatory motive. The fact that someone gets fired peremptorily when in most situations the employer follows a different route really has nothing to do with undermining motivation. What case has ever said lack of a final warning is pretextual as opposed to just an employer's decision that it's allowed to make with respect to employees? The case law, Your Honor, does say that when a company does not follow its regular policy for an employee, that can be evidence of pretext, and that's what happened here with respect to the final written warning. Hadn't she received two final written warnings in close proximity to this time anyway? She had received a final written warning on November 9th of 2016, and that raises an interesting point, Your Honor, because the draft final written warning that CRC supposedly was going to give to her had a November 9th date as their last event point. It had no new event points reflected on the draft March 23rd final written warning, and under the company's own policy, the event point of January 2016 should have rolled off. She should have lost a point by the time the final written warning came off. I think this also lends to the pretext argument that by not getting her final written warning, Ms. Evans had no opportunity to assess what her status was or challenge whether she had the proper number of event points attributed to her or not under the company's policy. The one in January should have rolled off, but that wasn't reflected even on the draft form that purportedly was prepared and was going to be given to her. More importantly, there was no urgency to fire her. They could have contacted her doctor or had her contact the doctor for some more certification of whether the last events in March were related to her FMLA condition, but they didn't. They fired her, and once she was fired, she lost her rights to follow up with the FMLA recertification as indicated by the case law that exists. I'm sorry, go ahead. I was just about to alert you to your time, but I noticed it. And I would reserve the balance for rebuttal. All right. Thank you, sir. Thank you. Mr. Stenmo. My name is Greg Stenmo, and I'm here on behalf of the Kelly Cooperative Response Center. First thing I want to do is acknowledge my partner, Catherine Short, who did an exceptional job of briefing on this case. She would be arguing this case this morning, but she's at home with a new baby, so I'm here in her stead. Judge Smith, you mentioned the Garrison case. I am familiar with that case, and I think it is particularly poignant in this situation because the ruling in that case, where Your Honor was involved, was a firm summary judgment. And Dollar General had a two-step process to request leave, notify the manager, and then notify a third-party leave administrator, and this court approved that process. With regard to the July knee injury, the orthopedic specialist who examined Evan's knee noticed that she'd been experiencing knee pain for six weeks. And he said, quote, has been doing some gardening. She thinks it may have come from that. And then the orthopedic surgeon concluded his examination by saying, quote, I do not believe the patient's symptoms in the right knee are due to her reactive arthritic changes. I believe working in the garden may have irritated the knee. And then notes from the July 11 appointment say nothing about a knee injury, and the note from the doctor on July 12 say nothing about those absences being FMLA-related. I'd like to spend the balance. Counsel, before you move on, would you address a little bit more that 7-11 date in terms of what actually, was there any leave request made for the absence due to the doctor visit on 7-11? Let me look. I don't, let me look to see. I don't believe so. She reported that her knee had given out. She didn't say anything about FMLA. And Ms. Evans was quite schooled on how to say something's related to FMLA. We have a number of notes, emails and things when it was email-related or FMLA-related, she would say that. The only thing that she reported was that her knee had given out, which doesn't tie it to her reactive arthritis. And then we received confirmation from her doctors saying that, no, it had nothing to do with her reactive arthritis. Does your company have, or your client, did the company have any policy or program for enabling employees to cure deficiencies in their FMLA processing in terms of making sure their notices are adequate, or being educated on the necessity of notifying both the supervisor and HR and why that was an important part of your policy other than just creating hoops? Yes. So what happened was there was testimony in the record that Nancy Morrison, plus another supervisor, had talked to her on several occasions and asked her, you know, And so it was put on notice in writing that she had exhausted her FMLA. And she certainly had the opportunity to go back to her doctor and ask for more FMLA. She didn't do that. In fact, the company, during the course of 2016, four times went to her doctor to get certification. The most recent time was in October of 2016, and the doctor never increased her FMLA certification. And I think it's also an important point is that even after her termination, Ms. Evans went to see her doctor, and she complained about being fired, and her doctor never changed her certification. And said, gee, you know, she really should have had more FMLA, or she should have really been granted more time or duration. So her doctor had an opportunity to increase it. She had an opportunity to increase it. We reached out to her. We told her that you're exceeding your time. We asked her, you need more time, and she didn't take advantage of those opportunities. When the termination occurred, did she have FMLA leave on the books? She did. She had more FMLA leave on the books, but she had exceeded the time that she had been certified for. And what's, I think, important is that those last couple of absences that ended her employment, that she has never claimed that those absences were FMLA related to this date. She had an opportunity in her deposition to say that. She had an opportunity in the declaration that she submitted to the court to do that. Her doctor had an opportunity to say that after her termination in his deposition. At no time has she ever said that those last absences were FMLA related. Now, her physician recommended that she have two full days and two half days, if I recall what was recommended by the physician. On 8-12, she was given a half point, or took a half point. Was it possible to combine the two half points to make a full day, or could the half points only be used on different days? The half points could only be used on different days, and that was another thing where if Ms. Evans felt that she needed to have more time or this was inadequate, she could have gone to her doctor either before or afterwards, and she never did that. The reason that she got a half point on November 9, you just have to look at the appendix at 140, which is cited by Evans to understand why. She would have been approved for two full days and two half days, and when you look at the 30-day timeframe prior to November 9, she had used a full FMLA day on October 11, and a full FMLA day on November 8, thereby exhausting her full day allocation. And when she took a full day on November 9, she was only authorized for a half day. Accordingly, she was awarded a half a point. And she never contested that, and she never went to her doctor to say, gee, I should have had more FMLA time. With regard to the alleged questions of fact and pretext that have been identified, Judge Loken, you noted that that's really not evidence of pretext. She, in fact, did have two final written warnings dating back to November, and it was undisputed that when she was absent in March, she had incurred her 10th point. And when she was terminated on March 27, that was the first business day after her absences. So, Judge Loken, I think you're absolutely correct that, you know, that is not evidence of pretext. It's not discriminatory motive. And there is no case law that says that just because you didn't hand somebody a final written warning on the day before your termination that that's evidence of pretext. There's also a claim that CRC inconsistently applied its attendance policies. Evans has failed to identify any similarly situated employee who had attendance record like her and who was not fired. She even admits that she, in her own words, I went over on occurrences and they had to treat everyone the same. And she had chronic attendance issues before her autoimmune disease was diagnosed. In 2014, she was at eight points. In 2015, she was at seven points. They make a claim that CRC lied about her attendance points, but these alleged lies are simply Evans denying that she had a conversation with Nancy Morrison on September 15. During which Morrison told her she had nine attendance points. And if you look at our appendix 89-90, it clearly shows that during the nine month timeframe through September 2016, Evans had indeed incurred nine points. And so Evans conveniently ignores the point that she received on January 25th of 2016. And it's really important that it's the explanation for termination that has to be unworthy about belief. And just because there's a question of fact about who said what and when, questions of fact are not converted into lies simply because plaintiff has chosen to characterize them that way. But when you get to the core of it, CRC has never faltered from stating that Evans was terminated on March of 2017 for chronic absenteeism. And some conversation in seven months before termination, which may or may not have occurred, is irrelevant to that. She also claims that their 30-day rolling policy didn't exist, but Evans admitted in her deposition that she knew about the policy. She also ignores the email that she received from Human Resources, which is at our appendix 87 and appendix 140, that tells her and explains the rolling 30-day policy. She claims that there were... Counsel, would you explain for me the rolling 30-day policy versus the rolling 12-month policy? Yeah. So, CRC had a policy that when you're taking FMLA, they'll look at it on a rolling 30-day time frame, so that if you're certified... Just tell me what that means. Give me... How does it affect these calculations? Nobody explains that in the briefs that I can figure out. Yeah. So, I'll give you an example. So, she was certified for two full FMLA days per month. And so, if she took one FMLA day in the end of October, and then she took another full FMLA day at the beginning of November, she would have exhausted those two full days during that rolling 30-day time frame. So, there's not a hard cutoff, just because you turn the calendar, you look at a 30-day time frame, because that's what her doctor certified. Say, during a 30-day time frame, then you get two full days and two half days. Is that the company policy for all FMLA applicants, or was that just something employed for her? No, that's for everyone. And she's not identified anyone who had a different experience. Is that 30-day policy... Was that in writing and supplied to the employees? Yes. In fact, Ms. Evans was personally given the policy in, I believe it's Appendix 140, where they explained the 30-day FMLA policy to her. And she admitted in her deposition that she knew about the 30-day rolling policy. What is the benefit of having a 30-day rolling policy rather than a calendar month policy? In some ways, it can actually benefit the employee, because you could have a situation where you have a lot of absences at the beginning of the month, but then you don't have any later on. But then you turn the calendar, and then you would reload. So, depending on the situation, it could be actually beneficial to the employee to have a rolling 30 days as opposed to a hard and fast, you know, these are the times you get for this month. With regard to talking about the shifting reasons that they claimed that existed, there are a couple of cases that this court has actually been involved in. In the Baradwa Mid-Dakota case, and also the Button v. Dakota case, Judge Loken and Judge Smith. In the Button case, which was from June 30th of this year, the court said that shifting explanations for their follow-up policy failed because of a lack of sufficient evidence to cast doubt on the legitimate non-discriminatory reason. And in the Baradwa Mid-Dakota Clinic case, Judge Loken, you indicated that shifting explanations were insufficient because the employer never wavered from its view that interpersonal difficulties were the central reason to be sure he had other problems, but never shifted his focus from the main one, perhaps using different words to describe it. And in this case, we have never wavered from the position that she had exhausted all of her, or she had violated the attendance policy. The get-out-of-jail-free policy, if you read it, it doesn't apply to her, and she wouldn't have been able to use it. She can't use it to get out of the termination. And it looks like my time is up. Unless you have questions, I will close out. And I believe you should affirm the well-reasoned opinion of Judge Montgomery. Thank you, Mr. Stenmaul. Mr. Fiebinger? Thank you. The rolling 30-day policy was extremely confusing, and it was not explained anywhere or set out anywhere in print. Ms. Evans denied knowing about it or understanding it, for that matter. An example is November. She used FMLA twice in the month but was assessed points on November 9th. That's not a fair policy, and it's very confusing. With respect to the FMLA leave on July 11th, she was originally approved for that. The FMLA calling form, which is at Appendix 105, shows that she was approved, and she was unapproved later. There was no explanation about how half points could only be used on one day, or on two days, but not one day, but yet she was assessed points. I defer to the balance of the arguments in the brief that we submitted. Thank you, Mr. Fiebinger. Thank you. Thank you. The court wishes to thank both counsel for your presence before the court in our virtual forum to get our hearings processed. We appreciate the briefing that you've submitted, and we'll take the case under advisement and render a decision in due course. Thank you both. Thank you, Your Honor. Excuse me.